Report of Philip Matteson
Matteson Investigations LLC
P.O. Box 643
Cascade, MT 59421
Ph: (406) 403-1753

Date of Report: September 30, 2016

Re: Review of documents in Audemio Orozco-Ramirez vs. Jefferson County, Montana, Cause No. CV-15-62- H-CCL.

I, Mr. Philip Matteson, was contacted by Attorney Gregory Bonilla on July 12, 2016 and was requested to review documents in the above-titled case regarding the investigation of the Jefferson County Sheriff's Office. Mr. Bonilla represents the Jefferson County Sheriff's Office (JCSO) personnel and Jefferson County. The Plaintiff is suing Jefferson County. Mr. Bonilla requested that Mr. Matteson review the case and render an opinion if the investigation by Jefferson County Sheriffs' personnel was appropriate. A review was completed, and a report on Mr. Matteson's opinions was provided to him on September 30, 2016.

On July 13, 2016, Mr. Matteson received documents from Mr. Bonilla. The documents received and reviewed were:

COMPLAINT AND DEMAND FOR JURY TRIAL Case 6:15-cv-00062-CCL

File folder labeled County Attorney Documents containing;

File folder labeled Correspondence containing;

Haque-Hausrath ltr to Johnson and Doolittle.13.10.18 pdf

Davis ltr to Haque-Hausrath re discovery.13.11.04 pdf



EXHIBIT A

The video comes from one camera which covers all of the bunk areas of A-pod. It also covers the only table where some inmates eat and board games are generally played. The cell has five bunk beds on the wall furthest away from the camera and is a dormitory type setting. The video covers the curtain door to the bathroom and shower area. The video has a night mode and even when the lights are off, there is sufficient clarity to identify inmates moving about the cell. Mr. Matteson would note that Mr. Orozco-Ramirez's (original) bottom bunk was directly to the far right, closest in the camera view. This provided a good view of activity in that area. Mr. Matteson is confident that no inmates could have gathered between the camera and Mr. Orozco-Ramirez's bunk to block the view for other inmates to assault Mr. Orozco-Ramirez. This would have been very obvious had it occurred. Mr. Matteson also believes that any attempt to block the camera by holding something in front of it would have been obvious. Neither situation was observed during the videos that were reviewed.

The following observations from the video were noted which are specifically referenced in this report:

*Ch 7_20131004_1600 (PELCO)*

At approximately 1621 hours, Mr. Orozco-Ramirez appears in the cell. This time frame is consistent with his approximate booking time. Another inmate assists him with holding up his mattress and sliding the sheet onto it. This assistance is observed between other inmates on later occasions as well, as the sheets are apparently a tight fit. This is not consistent with his complaint of being harassed upon his arrival. Mr. Orozco-Ramirez settles his belongings in the bottom right bunk corner area as viewed in the camera and then makes a telephone call. He then returns to his bunk. Another inmate with papers or books sits briefly beside him. Their body language is not

observed to be confrontational. During the next period of time until dinner is served multiple inmates come and go to the bathroom/shower area. Inmates not wearing their shirts and carrying their issued towels into the bathroom area are presumed to be taking showers. Inmates appear to be engaged in watching television, playing games and visiting. No bullying is apparent with anyone. No apparent gaps or lapses are noted in the video during this time.

At approximately 1728 hours, meals are served. Mr. Orozco-Ramirez gets a drink and a disposable meal box and goes back to his bunk to eat. The drink is received at the same time and location as all other inmates are getting their meal and drink. There is no opportunity for tampering. Mr. Orozco-Ramirez is done eating at approximately 1733 hours. He gets up at approximately 1737 hours and puts his meal box in the trash across the room. He then returns toward his bunk.

At approximately 1737:54 hours, another inmate extends a cup to him and Mr. Orozco-Ramirez refuses it. At approximately 1740 hours, Mr. Orozco-Ramirez enters the bathroom /shower area carrying his towel. Mr. Matteson watched Mr. Orozco-Ramirez's bunk area very specifically during the time he was in the shower to see if any unseen cup in that area was tampered with. No such activity occurred. No one accessed the area of his bunk in his absence. At approximately 1743 hours, Mr. Orozco-Ramirez comes out of the shower with a towel over his shoulder and returns to his bunk. This is inconsistent with Mr. Orozco-Ramirez's statement that an inmate gave him coffee, he took it and set it by his bunk, took a shower, drank the (unattended) coffee and became sleepy.

At approximately 1748 hours, Mr. Orozco-Ramirez walked to the telephone and made a call. Again Mr. Matteson specifically watched his bunk area for any attempts at tampering with any

unseen cups. No such activity occurred. Mr. Matteson did not observe any other inmates paying attention to Mr. Orozco-Ramirez. They were engaged in their games and television watching and no conspiracy was apparent.

At approximately 1754 hours, Mr. Orozco-Ramirez completes his telephone call and gets himself a cup of coffee with an apparently new cup from the stack on the table by the coffee container. He returns to his bunk. No one approaches him while he is drinking that cup of coffee. The cup is visible in his hands and he does not put it down anywhere that someone else could tamper with it.

At approximately 1808 hours, Mr. Orozco-Ramirez gets up, gets a coffee refill and returns to his bunk.

At approximately 1834 hours, Mr. Orozco-Ramirez gets up, gets a coffee refill and returns to his bunk.

At approximately 1836 hours, the coffee container was removed from the cell block.

At approximately 1851 hours, Mr. Orozco-Ramirez entered the bathroom, exiting at approximately 1853 hours. He left his cup at his bunk. It is unknown if it still contained any liquid, but no one approached or had any opportunity to tamper with it. Upon his return to his bunk, Mr. Orozco-Ramirez wipes his hands on his towel.

This video track ends at 1900 hours.

*CH07_20131004_2000*

This video resumes at 2000 hours. There is approximately a one hour gap in the video provided for Mr. Matteson's review. This gap does not occur during the time frame of the alleged incident.

The sequence of events described by Mr. Orozco-Ramirez surrounding his fictitious drugging has already occurred and this period of time primarily appears to be other inmates being nice to him. The coffee container has been removed and does not return.

Mr. Orozco-Ramirez is observed on his bunk while other inmates are playing board games, watching television and conversing. At approximately 2139 hours another inmate converses briefly with Mr. Orozco-Ramirez and the inmate in the bunk above him. The other inmate appears to compare something regarding the head of the bunks (or perhaps the wall behind the bunks) between Mr. Orozco-Ramirez's bunk and the bunk to the left. The other inmate then goes to the (presumed) window where inmates contact detention officers and retrieves something which he then hands to Mr. Orozco-Ramirez. The retrieved item and subsequent activity would be consistent with fingernail clippers which are generally checked out by inmates in correctional institutions. Mr. Orozco-Ramirez appears to use the item and then hands it back to the inmate at approximately 2141 hours. The other inmate continues to visit with Mr. Orozco-Ramirez and/or the inmate in the bunk above and then returns to watching television. At 2147 hours, the inmate returns the item to the window.

This video track ends at approximately 2200 hours.

*CH07_20131004_2200*

At approximately 2200 hours, Mr. Orozco-Ramirez is on his bunk. Other inmates are engaged in board games, watching television and exercising. No one appears to be paying any attention to him. At approximately 2231 hours, Mr. Orozco-Ramirez goes to the bathroom. He is walking fine and no one appears to be watching him. At 2232 hours, he returns to his bunk. This is clearly contrary to his statements to R.N. Anita Alvarez that he fell asleep shortly after drinking his cup

experience on Montana Department of Corrections and Pre-Release Center community placement screening committees.

Paragraph 18 states, "After his arrival, Mr. Orozco-Ramirez was offered a cup of coffee which he accepted. He left the coffee unattended in the pod while he took a shower. He returned to the pod common area after his shower and drank the coffee." This statement is untrue. The video of this period of time is complete and conclusive evidence and has been described in detail in this report. The video during this time does not contain the gaps in time that occur late at night when inmates go to bed.

Paragraph 19 describes Mr. Orozco-Ramirez's claim of anal rape attack. He described that he "observed that some men seemed to be blocking the jail camera." The lack of video evidence to support this is part of the proof against this claim. The actual video evidence establishes that the camera sensors were sensitive enough and positioned properly to record when he got out of his bunk to go to the bathroom. Mr. Orozco-Ramirez alone could trigger the recording, but we are expected to believe that a group of people around his bunk and closer to the camera did not. After Mr. Orozco-Ramirez moved to the upper bunk, the sensors again activated to record the new occupant of the lower bunk when he got up to go to the bathroom at night.

Paragraph 20 states, "Mr. Orozco-Ramirez heard someone say "Sorry guy." Mr. Orozco-Ramirez stated that statement was made by the person in the bunk above him. Mr. Dewolf who occupied that bunk above Mr. Orozco-Ramirez was in the JCDC serving time for a DUI. He was released before this was reported. He was interviewed in his home and denied having seen or heard anything consistent with this claim. This reported statement heard by Mr. Orozco-Ramirez is also inconsistent with what he stated he heard as reflected in the medical exam notes.

Paragraph 21 states, "Mr. Orozco-Ramirez did not feel any strength to fight back. Eventually he lost consciousness. Based on his feelings of powerlessness, his disorientation and sickening feeling the next morning, he suspects that he was drugged." This has been thoroughly addressed in this report. Mr. Orozco-Ramirez did not demonstrate any disorientation or sickened feeling the next morning. He was more prompt than 70% of his cell mates in getting to his breakfast. He had multiple cups of coffee before spending more than a minute in the bathroom. Mr. Orozco-Ramirez showed no indication of having been drugged or being sick the following morning.

Paragraph 22 states, "In the morning, when Mr. Orozco-Ramirez awoke, he was fully clothed. He felt pain and pressure in his abdominal region and pain and tenderness in his rectum. Some of the other detainees were in the shower. He waited until the shower was unoccupied, and when he went to the bathroom and removed his clothes, he felt and saw semen leak out of his rectum." The video beginning the morning after this alleged event is complete with no noticeable skips. Mr. Orozco-Ramirez was clothed when he awoke. Mr. Matteson has never investigated a gang rape scenario or individual corrections rape where the suspect(s) dressed the victim. Mr. Orozco-Ramirez complains of pain and pressure and tenderness, yet he was observed to be more interested in breakfast and coffee than getting to the bathroom to check these alleged conditions out. The bathroom was mostly unoccupied from the time he got up until he went inside the bathroom. When he finally first went inside, over an hour after he had been up, it was for less than a minute and he carried his cup into the bathroom. Immediately, upon exiting the bathroom, he filled his cup with coffee. The period the bathroom was mostly unoccupied prior to his next entry was over one hour and forty five minutes after he got up. His movements and interests in food and drink and general tidiness were not consistent with the symptoms described. Mr. Orozco-Ramirez's claim that some of the other detainees were in the shower when he got up is

false. He did not have to wait until the shower was unoccupied to go to the bathroom. He waited until he was done with breakfast and coffee. No one took a shower that morning until 10:46 a.m. and they had all gotten up for breakfast by 7:03 a.m. No group showers were taken. All showers were individual. This has been discussed previously in this report and Mr. Orozco-Ramirez's statement is untrue. The carefully crafted wording in this statement "when he went to the bathroom *and removed his clothes*, he felt and saw semen leak out of his rectum" is apparently designed to lay the groundwork for why none of this semen was found by the lab in his underwear, other clothing or bedding. This is inconsistent with the previous versions including, "He said when he stood up to walk to the bathroom, he felt fluid, which he believes was semen, leak out of his rectum" and "When he woke he was dressed Pt felt moisture in his pants. He went to the BR and states sperm came out of his rectum." If the assault happened, there should have been semen stains in the back and bottom of his underwear. There were none.

Paragraph 23 states, "On evidence and belief, there is evidence of semen on the clothes Mr. Orozco-Ramirez wore that night." The location of the diluted DNA sample obtained in the underwear of Mr. Orozco-Ramirez is critical. It was not in the back or the bottom of the underwear. It was in the interior front. This is not consistent with leakage from his rectum. The diluted sample which could not be analyzed by the Montana State Crime Lab because it required amplification by a private lab is consistent with the given explanation that the laundry was done without bleach. Mr. Matteson has submitted DNA evidence to the Montana State Crime Lab many times and received very positive results. Only severely deteriorated, damaged or diluted samples require amplification in private labs. Mr. Matteson has had positive DNA results on semen samples over 50 years old with the Montana State Crime Lab. Mr. Matteson believes that if this had been a straightforward fresh semen stain, it would have required no amplification or

violently in the same area would trigger the same recorder. The citing of a quote from a newspaper reporter without context of the entire conversation holds no credibility.

Paragraph 53 states, "It has now been over eighteen months since Mr. Orozco-Ramirez was sexually assaulted and as far as Mr. Orozco-Ramirez knows, no charges have been brought against any of the other inmates in Pod A, or any Jefferson County Detention Center staff. No information regarding the progress of any investigation is being shared with Mr. Orozco-Ramirez." First, no charges against inmates or staff are appropriate in Mr. Matteson's opinion. Secondly, Mr. Orozco-Ramirez is represented by counsel. JCSO cannot contact him. Mr. Orozco-Ramirez's attorney has been adversarial in the written communications reviewed and possibly planning a lawsuit. JCSO would be foolish to communicate with him except through counsel. It is unclear what possible criminal charges are implied that should have been brought against staff at the JCDC. The only prosecutable criminal charge that appears appropriate in this case, in Mr. Matteson's opinion, would be a charge of False Reports to Law Enforcement (MCA 45-7-205) against Mr. Orozco-Ramirez.

**Conclusion**

Mr. Matteson has conducted hundreds of criminal investigations involving sexual assaults and rapes. Mr. Matteson has conducted hundreds of investigations involving correctional institution assaults, both at county jails and state prison level, many of which were rapes. Mr. Matteson has conducted investigations involving multiple assailants on one victim. This case is highly inconsistent in many ways with what is normally found in evidence in such cases. Anal rape crime scenes are messy. Mr. Matteson's experience investigating such crimes would lead him to expect significant blood and fecal matter on the bedding and clothing of all involved. In Mr.

Matteson's experience gang rape situations are often more physically violent than singular rape situations. The pack mentality fuels the participants into a more violent frenzy and significant injuries and bruises are expected. As stated earlier in this report, a group assault scenario in a correctional setting is generally noticeable before and after the incident by an increased excitement level observed with the involved inmates. Nothing consistent with this was observed on the video reviewed.

The drugging theme has been adequately addressed to be sufficiently debunked, but Mr. Matteson would note that he has never seen a case where inmates in possession of drugs would waste the drugs on another inmate in order to rape them. If an inmate has drugs in a correctional setting, he keeps them for his own use or barters them for his own advantage. If an inmate plans to rape another inmate he does it without drugs. If multiple inmates plan to rape another inmate there is even less reason to waste drugs.

Mr. Matteson would note in summary that the two closest inmates to Mr. Orozco-Ramirez at the time he alleged this assault happened, were a veteran who was in jail for the first time and a traffic offender serving time for a DUI. Both were already removed from JCDC when interviewed and both denied hearing or seeing anything to support this incident. Detention cells are acoustically "hard" rooms and sound carries very well in such rooms. No one in the cell reported hearing any assault when they were interviewed.

It is Mr. Matteson's opinion that the evidence he reviewed was the result of the JCSO investigation which sufficiently proved that the allegations by Mr. Orozco-Ramirez were completely false. Multiple specific events described in detail and absolutely related to the fictional story made up by Mr. Orozco-Ramirez as happening before and after the alleged assault

are proven absolutely untrue. His untruthfulness is established by his own multiple contradictory statements, lab analysis including DNA testing, two drug screenings, witness interviews and by the inmate video, which was working in a manner to positively disprove these important portions of Mr. Orozco-Ramirez's fictitious report to law enforcement.

**Additional observations:**

Discovery is ongoing, and Mr. Matteson reserves the right to amend and supplement this report with respect to additional facts and documents that may be produced.

P Matteson

Philip L. Matteson