

# CORRECTIONS EXPERT'S REPORT

## ON

## Jefferson County Jail

## Jefferson County Detention Center

## Cascade County Adult Detention Center

## Complaint No. 14-02-ICE-0021

Prepared by:

Wendy S. Still, MAS

Roseville, CA

August 24, 2014

Privileged and Confidential

For Official Use Only

*Protected by the Deliberative Process Privilege*     1

**EXHIBIT B**

- Reviewed detention and inmate files
- Spoke with various facility staff and management during the course of the review
- Met with various ICE staff during the course of the review
- Reviewed partial camera video recording of JCJ Detainee #1's housing area October 4-5, 2013
- Reviewed written investigatory interview reports from inmates housed with Detainee #1 at JCJ during the period of October 4-7, 2013
- Reviewed audio recording translation of Detainee #1's five telephone calls (post onsite)
- Reviewed full camera video recording of JCJ Detainee #1's housing area for the period of October 4-7, 2013 (onsite and post onsite)

In the context of this report, a finding of "substantiated" refers to an allegation that was investigated and determined to have occurred; a finding of "not substantiated" refers to an allegation that was investigated and the investigation produced insufficient evidence to make a final determination as to whether or not the event occurred; and a finding of "unfounded" means an allegation that was investigated and determined not to have occurred.

## VI.   FINDINGS, ANALYSIS, AND RECOMMENDATIONS

### A.   Allegation 1, 2 and 3 – Sexual Abuse and Assault Prevention and Intervention and Failure to Provide Medical and Mental Health Care Post Assault

*1.*          *Allegations and Findings*

*Allegations:* The National Immigrant Justice Center alleged in the November 13, 2013 complaint filed on behalf of Detainee #1, failure of ICE to have adequate policies in place that would have provided protection of Detainee #1 against sexual assault while held in ICE detention and failure to require JCJ to adhere to PBNDS 2011, related to 2.11 Sexual Abuse and Assault Prevention and Intervention policies. Detainee #1 was housed at three different facilities during the period of October 4 through October 16, 2013. Detainee #1 alleged that he was sexually harassed on October 4, 2014, then drugged and sexually assaulted during the early morning hours of October 5, 2013 while housed at the JCJ. Detainee #1 also alleged that he failed to report it as he was unsure of who were the officers were as they were not appropriately identified and seemed to be controlled by inmates housed at the facility.   Detainee #1 also alleged that he failed to receive his prescribed medication related to the alleged sexual assault and he also did not receive adequate psychological help or any type of counseling after the alleged assault occurred.

*Findings:*

- Detainee #1's allegation that he was drugged and sexually assaulted is not substantiated.
- Detainee #1's allegation that detention officers were not appropriately identifiable is partially substantiated.
- Detainee #1's allegation that officers seemed to be controlled by inmates housed at the facility is unfounded.
- JCJ Sexual Abuse and Assault Prevention Policy does not comply with ICE's October 6, 2006 Sexual Assault Awareness Information Memorandum to All Field Office Directors by John P. Torres, Acting Director

- Detainee #1's allegation that he did not receive the prescribed medication related to the sexual assault is not substantiated.
- Detainee #1's allegation that he failed to receive adequate psychological care or any type of crisis counseling after the alleged assault occurred is partially substantiated.
- ICE policies related to facilities holding detainees for under 72 hours is unclear and should be clarified to the field that these facilities must comply with the appropriate governing Detention Standard.

2.  *Analysis*

Detainee #1 was released from ICE custody on October 16, 2013 and was not interviewed during the onsite investigation. Detainee #1 arrived at the JCJ on October 4, 2014. In the JCJ intake area there was a small poster behind the Detention Officer's desk that was written in English regarding how to contact the Office of the Inspector General regarding filing a complaint. No other posters, pamphlets or other materials were available to Detainee #1 that would have provided him information on how to file a complaint. While the PBNDS 2011, 2.11 Sexual Abuse and Assault Prevention and Intervention standard was not implemented until March 7, 2014, the ICE October 6, 2006 Sexual Assault Awareness Information Memorandum to All Field Office Directors by John P. Torres, Acting Director was in force during the period of October 4-16, 2013 when Detainee #1 was in ICE custody. The facilities that held Detainee #1 during this period were obligated to comply with the October 6, 2006 memorandum and ICE was obligated to ensure compliance.

The October 6, 2006 memorandum states:

*"It is the responsibility of U. S. Immigration and Customs Enforcement (ICE) to provide appropriate conditions of confinement and detainees in ICE custody have a right to be safe and free from sexual harassment and assault. Attached for your review and immediate dissemination, is the ICE Sexual Assault Awareness information for ICE detainees. These documents have been prepared for use in ICE Service Processing Centers, Contract Detention facilities, and Inter-Governmental Service Agreement locations. The information is provided in both poster and pamphlet format for ease of distribution. The poster information should at all times be prominently displayed in common areas where detainees can have access to the information such as in housing units. The pamphlets should at all times be available in housing units and libraries so detainees can easily obtain a copy."*

The Sexual Assault Awareness Information pamphlet contains information that would have been critical to addressing many of Detainee #1's concerns including: awareness, definitions, prohibited acts, detention as safe environment, avoiding sexual assault, reporting assaults, next steps after reporting a sexual assault, the medical exam, understanding the investigative process, and the emotional consequences of sexual assaults.

The JCJ did not display or post anywhere in the facility, including in the housing unit, the Sexual Assault Awareness Information as required by the October 6, 2013 memorandum, nor did the facility provide a copy of the Sexual Assault Awareness Information pamphlet or an equivalent to Detainee #1 upon entry into the facility. No information was posted in the housing units, on the housing windows or in any area visible to detainees other than the small sign posted behind the officer's work station in the intake area where detainees are present for only a short time during the intake process.

During the onsite investigation CRCL staff and I interviewed numerous JCJ custody employees including the Sheriff, Undersheriff, Jail Commander, and Detention Officers, reviewed facility policies and job duty statements, job descriptions, and toured the facility. The environment, inadequate sexual assault prevention and intervention policies, outdated job descriptions that do not even address sexual assault prevention and intervention related duties, and operational practices all fail to protect detainees held at this facility from sexual harassment and assault. JCJ has a Prison Rape Elimination Act policy, D-600 that is dated August 1, 2012. It does not contain the required components necessary to comply with the PBNDS 2011, 2.11. If detainees are going to continue to be held at this facility, D-600 must be re-written. All staff must also be provided with sexual assault prevention and intervention training. The facility's policy requires training during initial employee orientation and annual refresher training. As of the date of the onsite investigation, the majority of staff had not been trained. The Sheriff was waiting for the State of Montana to provide the PREA training lesson plan and policy guidance.

Staff job descriptions including the Sheriff, Undersheriff, Jail Commander/Supervisor and Detention Officer were contained in the JCJ Chain of Command policy, A-100. The policy provided was dated January 30, 1999 and none of the job descriptions addressed any requirements related to sexual assault prevention or intervention duties.
The JCJ intake screening tool does not comply with PBNDS 2011 2.11 and the Federal Department of Homeland Security Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities adopted on March 7, 2014.

I have reviewed the entire JCJ housing unit video footage of Detainee #1 during the period of October 4-7, 2013. Two videos were provided for review. The original video footage is unreliable based on programming problems with the Pelco video system. The second video was produced by the Pelco video technician after the technician adjusted the beginning recording movement time lapse. While the second video was not perfect, it did provide sufficient clarity and footage needed for my investigation. After the alleged assault was reported, Sheriff Doolittle contracted with the manufacturer of the Pelco video recording system to perform onsite maintenance of the system and reset recording parameters, so there would not be a delay in recording. When the video recording system was initially installed, the system had been set to begin recording when movement occurred within the area being recorded. There was a short delay that occurred from the time the movement started and when the recording began. The system has now been reprogrammed to start recording previous to movement occurring. Even with the recording problems, I was able to observe the movement within the housing unit for the majority of the time that Detainee #1 was housed at JCJ. There was no apparent attempt by the other inmates housed with Detainee #1 to block the camera from recording, or any visible attempt to manipulate any recording from occurring as Detainee #1 alleged.

Based on my review of the two videos, it is apparent that inmates were not controlling officers or any other staff. Detainee #1 was housed with nine other inmates. Movement of inmates and Detainee #1 inside the housing unit appeared to be routine and normal for a correctional facility. Detention Officers performed their required checks. Detention Officers were required to wear uniform tops that had Jefferson County Sheriff's Department logo embroidered on the shirt; however officers were allowed to pick their shirt color, which could have caused confusion for the detainee regarding who the officers were. It is standard correctional practice to have a

standard color and type of uniform worn by all officers. It is also standard correctional practice for officers to wear a name tag with the first initial and last name of the officer. Detention officers are not required to wear name tags at this facility which also makes it difficult for a detainee to know who he is addressing.

During October 4-7, 2013, Detainee #1 moved throughout the housing unit including the shower/bathroom area, drank coffee, talked on the telephone to his wife, ate, and slept before and after the alleged assault occurred. Detainee #1's movement did not appear to be altered in any way after the alleged assault occurred. He did not walk or move as if he had been physically assaulted. He continued to drink beverages; even though he alleged that his coffee was drugged prior to the assault occurring.

I reviewed the translations of five telephone calls that Detainee #1 had with his wife. During the telephone calls, Detainee #1 did not mention any type of assault or unusual incident and the detainee did not appear to be overly emotional as one would have expected if he had been recently assaulted.

Detainee #1 departed JCJ on October 7, 2014 in the morning. He was then transported to JCDC by two ICE transport teams of two ICE officers. The two ICE officer teams met at a pre-arranged spot, one team transporting the first leg of the transport and the second team transporting the second leg of the transport to JCDC in Rigby, Idaho. Detainee #1 did not report the alleged assault until after the second ICE officer transport delivered him to JCDC, in Rigby Idaho on October 7, 2013. The second transport team had a bilingual officer. Detainee #1 could have at any time during the first or second leg of the transport to JCDC reported the alleged sexual assault, but did not. Detainee #1 waited until after the second ICE transport team had dropped him off at JCDC to report the alleged assault. The second transport team then returned to JCDC on October 7, 2013 and transported Detainee #1 to the Eastern Idaho Regional Medical Center for a sexual assault (rape) exam and medical treatment. ICE did not require the transportation officer to provide written reports regarding the detainee's demeanor and any comments he made during the transport. This was a missed opportunity to collect information that could be critical to the investigation.

ICE also immediately notified JCJ of the sexual assault allegations and JCJ detention staff was then able to retrieve Detainee #1's unlaundered clothes from the laundry basket located in the intake and release area. Detainee #1 was the last individual who departed JCJ, so his clothing and bedding were on top of the almost empty laundry basket. Detainee#1's clothing and bedding were collected and processed as evidence. Detainee #1's clothing and bedding was sent to an outside laboratory for testing. Based on Detainee #1's account of the alleged sexual assault, semen should have been present in the back of the underwear or on the sheets. None was found on either surface. Sheriff Doolittle also sent the evidence to a second lab for testing. The results were still pending at the time of this report.

Chief Deputy Sheriff Bob Gleich was in charge of the investigation and he coordinated with other law enforcement agencies to interview with inmates who had been housed in the unit with Detainee #1, but since had transferred to other facilities. Chief Deputy Gleich also conducted some of the interviews. All nine reports were consistent. No other inmate had observed or heard Detainee #1 being sexually assaulted during the early morning hours of October 5, 2013.

Nine inmates and Detainee #1 were housed in 5 bunk beds in a single housing unit that was not expansive and therefore the bunks were fairly close to each other. It is very unlikely that an assault as described by Detainee #1 would have occurred without an inmate seeing or hearing something. It is important to note that the nine inmates housed in the unit were serving different types of sentences and lengths of time and would have no motivation for covering up for another inmate. I will address classification deficiencies at JCJ in the classification section of my report. Based on my reviewed of the JCSO's Investigation report of the alleged sexual assault, it is my opinion that the JCSO conducted a thorough investigation. While the investigation had not yet been closed by Chief Deputy Gleich, it was his opinion that the alleged sexual assault did not occur. The rape kit collected at the Eastern Idaho Regional Medical Center also did not produce any evidence to support the alleged rape occurred. Based on my review of the evidence, I concur with Chief Deputy Gliech's preliminary finding that the alleged rape did not occur.

If the alleged assault did not occur, what could have been the motivation for Detainee #1 reporting the alleged assault? Detainee #1 had previously been removed by ICE. Detainee #1 was notified by ICE staff on October 3, 2012 that Homeland Security intended to reinstate the November 11, 2011 prior order of removal and that he did not have a right to a hearing before an immigration judge. In the second phone call to his wife, Detainee #1 told her that he was being moved on Monday, which was October 7, 2013. In the third call to his wife, Detainee #1 told her he would not see a judge. Based on Detainee #1's prior November 2011 removal, he was facing immediate removal with a 20 year restriction from returning to the United States. Detainee #1 was also facing permanent separation from his family, including a wife and seven children, ages 15 years to 5 months who were currently residing in Montana. This situation could provide extreme motivation for Detainee #1 to find a way to stay in the United States and significantly contribute to him being emotionally distraught. Further, the sexual assault allegations resulted in Detainee #1 not being removed during the week of October 7, 2013 and in fact Detainee #1 was released to the community and his family on October 16, 2013. Detainee #1 also alleged that his medications were not transported with him from JCDC and did not arrive with him at the CCADC in Great Falls, Montana. ICE transport staff remembers the medication being transferred with him to the ICE office in Helena, Montana, where he was interviewed. There is a Badger Medical sick call record entered by Dean Buys on October 9, 2013 noting the "patient was seen in the ER two days previous [October 7, 2013] for PREA evaluation". There were also extensive notations in Detainee's same medical record on October 9, 2013 by Jeffrey Keller, Medical Director, recording that he had discussed the case extensively with ICE and JCDC officials. Jeff Keller also noted the detainee was alert, displayed normal vitals, and had normal interactive conversation via an interpreter. The medical plan also entered in the record by Jeffrey Keller included Truvada, one tablet per day for 28 days and the prescription was called into Walgreens.

On October 10, 2013 Detainee #1 was transported to CCADC in Great Falls, Montana. During the intake process, Joshua Wojciechowski was the Booking Officer. Officer Wojciechowski used an English to Spanish translation book to communicate with Detainee #1. Officer Wojciechowski allowed Detainee #1 to use the telephone after the booking process was completed. Detainee #1 handed the phone to Officer Wojciechowski, to speak with Detainee #1's son who was on the telephone. The son asked the officer when Detainee #1 would receive his medication. The officer told the son the medication would be given to medical. Officer Wojciechowski could not